## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES KRIK, | | |
| | Plaintiff, | Cause No. 01 MDL 875 |
| v. | | |
| BP AMERICA, INC., et al., | | Case No. 11-CV-63473 |
| | Defendants. | *Trans. from IL-ND Case No. 10-CV-07435* |

### PLAINTIFF'S CONSOLIDATED RESPONSE
### IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

Plaintiff responds to the following motions for summary judgment:

1.      Owens Illinois (pages 10-12)

2.      Weil-McClain (pages 12-13)

3.      Exxon Mobil Oil Corporation (pages 13-15)

4.      BP America, Incorporated (pages 16-20)

The deadlines to respond to the Westinghouse and Crane motions for summary judgment are extended per court order.

Plaintiff Krik has stipulated that he will not oppose, and that judgment, with each party to bear his/its own costs, fees and expenses, may be entered on the summary judgment motions of: Trane U.S. Inc., Ingersoll-Rand Company, Rapid American Corporation, Certainteed Corporation, Bechtel Corporation, Cleaver-Brooks, Inc., Union Carbide Corporation.

Evidence

1

Charles Krik worked from 1954 until 2000 in multiple trades.  (Ex. 4 at Ex. C.)  Charles served in the United States Navy for 16 years, where he did maintenance work on ships.  (Ex. 1, at 11.)   After an honorable discharge from the Navy, Charles worked in the civilian sector as a boilermaker (1970-74) and then a pipefitter until his retirement in 2000.  (Ex. 1 at 11, Ex. 2 at 53.)  Charles was diagnosed with lung cancer on November 21, 2008 and bilateral pleural plaque formation on June 14, 2011.  (Ex. 4 at 2.)

*Work History*

Charles worked in the Navy from 1954 to 1970.  (Ex. 1 at 11).  Charles was a boilerman and boilermaker during his navy career, but his duties included pipefitting and insulation work.  (Ex. 1 at 11, 18-19; Ex. 2 at 57, 58.)  Charles worked on repair ships for about 6 years of his naval career.  (Ex. 2 at 157.)   The repair ship assignments were for the Pacific destroyer fleet, the Atlantic fleet, and the valve shop for the *Tutuila* ship (Ex. 1 at 29, 66-67, 73-74.)  He had to leave the repair ship to work on other ships.  (Ex. 2 at 157.)  As an example, the *Bryce Canyon* (BC) Pacific destroyer repair ship would have up to four destroyers docked to its sides while the crew from the BC performed repairs on the adjacent vessels.  (Ex. 1 at 21.)

Charles's naval assignments were:

- 1954 to 10/1958:  *Jenkins*, *Walker*, *Taylor*, and *Sproston* (destroyers) (Ex. 2 at 55; Ex. 3 at 1.)

- 11/1958 to 1961 *Bryce Canyon* (destroyer repair ship) (Ex. 1 at 14.)

- *USS Vulcan* 1963 - 1965 (amphibious vessels, tankers, troop transport Atlantic

2

fleet repair ship) (Ex. 1 at 66, 67.)

• 1965-66 *Tutuila* (had valve repair shop for other ships) (Ex. 1 at 72.)

As a civilian, Charles worked as a boilermaker and pipefitter.  (Ex. 1 at 15-17.)  He worked as boilermaker for Boilermaker's Union Local 1 in Chicago from 1970 to 1974.   (Ex. 2 at 53.)  From 1974 until his retirement in 2000, he worked as a pipefitter for Chicago Local 597 of the United Pipe fitter's Association.  (Ex. 1 at 16-17.)  He served as a foreman on several jobs (Ex. 1 at 144.)  Charles was trained in asbestos removal to recognize what materials were asbestos; he took an OSHA course in 1990 where he obtained this training.  (Ex. 1 at 78-79.)

The exposure evidence as to each of the defendants is discussed below.


*Owens-Illinois*

From 1954 until 1961, Charles was assigned to work on several destroyers in the pacific fleet.  (Ex. 1 at 20.)  In October 1958, Charles was assigned to the *Bryce Canyon* ("BC") repair ship for the Pacific destroyer fleet.  (Ex. 1 at 14.)  His assignment on the BC continued into 1961. (Ex. 1 at 72.)

When directly assigned to work on the destroyers from 1954 until October 1958, Charles did "a lot" of brickwork repairs that required Kaylo block insulation on the fireboxes of boilers. (Ex. 1 at 134; Ex. 6 at 1-2.)  Charles testified:

Q: So how did Kaylo come into play in that?

A: That's the first course.

            ...

By Mr. McCoy: All right.  What was your answer again?

3

Q: All right.  What was your answer again?

A: That's the first course of brickwork in a boiler, is insulating block.

Q: And how did you know about this, that it was standard?

...

The Witness: Because I've been using – I used it on destroyers, too when I – we used to do on our own – a lot of our own brickwork on destroyers, too.  You wouldn't wait to until you went alongside of the repair ship.  If we had to do it, then we'd order the stuff and do it ourselves.

(Ex. 1, pages 133-34 (objections omitted).)

The brickwork on fireboxes had to be rebuilt about every 18 months which required removal and replacement of the insulation block.  (Ex. 6 at 1.)  The Kaylo blocks crumbled into pieces when they were removed, typically using a hammer, and the pieces and dust were swept up.  (Ex. 6 at 1.)  Kaylo insulation blocks were delivered in cases containing 30 to 36 blocks. (Ex. 1 at 148.)  Three cases of Kaylo block insulation were required for insulation of the boiler's firebox, two cases for the superheater, and whatever was necessary for the steam drum.  (Ex. 1 at 136, 137, 148.)

After he was assigned to the *Bryce Canyon* (BC) repair ship beginning in November, 1958, Charles was responsible for ordering insulation materials for the Pacific fleet destroyer repair work.  (Ex. 1 at 132-33, 148.)   Kaylo insulation was a "standard" item in the Navy procurement book.  (Ex. 1 at 133-34.)  Kaylo was always used for the first course of brick on boiler fireboxes on the destroyers in the United States Pacific fleet.  (Ex. at 133.)   Charles began to order Kaylo block insulation within the first month of his assignment to the BC.  (Ex. 1 at

4

133-34.)

Kaylo was the most prevalent brand of insulation block in the Naval catalogues from which Charles ordered.  (Ex. 1 at 134-135.)  The temperature range at which Kaylo could be used made it suitable for a number of applications such as the brickwork on the boiler, superheaters, and steam drums. (Ex. 1 at 136, 137, 148.)

Owens-Illinois was the manufacturer of Kaylo beginning in the late 1940s and continuing until April 30, 1958, when the business line was sold to Owens Corning Fiberglas.  (Ex. 5 at 1.)  The "Military Quality Products List" dated September 1, 1953, lists Kaylo manufactured by OI as an approved product.  (Ex. 12.)  The Kaylo made by OI contained 13 to 25% asbestos.  (Ex. 5 at 7.)


*Weil-McClain*

As a civilian, Charles repaired boilers that were manufactured by Weil-McClain.  (Ex. 1 at 83, 106, 107.)  The Weil-McClain boilers were composed of cast-iron sections that sometimes required replacement.  (Ex. 1 at 106-108.)  When replacing sections, dust from rope wicking was used or wicking along with a paste was used to seal and insulate the section.  (Ex. 1 at 106-108.)

While repairing the Weil-McClain boiler of a judge whose residence was in Evanston, Illinois, Charles removed and replaced 21 sections of a boiler.  (Ex. 1 at 109-110.)  Charles used about 250 feet of wicking to seal and insulate the new sections on the boiler at the Judge's home.  (Ex. 1 at 109-110.)  While repairing another Weil-McClain boiler that was located at 43rd and Western in Chicago, Charles replaced 7 sections.  (Ex. 1 at 228-229.)

Charles also had to remove and replace the gaskets that were on the hoods of at least two

Weil-McClain boilers.  (Ex. 1 at 224-225.)  The gaskets went around the whole boiler.  (Ex. 1 at

224-25.)  Charles scraped off the crumbling gasket with a wire brush and scraper, a process that

generated asbestos dust.  (Ex. 1 at 224-225.)  Charles did not wear a mask while performing this

work.  (Ex. 1 at 231-233.)


*BP America, Incorporated*

As a civilian, Charles worked for a month at an Amoco chemical plant, where he repaired

condensers.  (Ex. 1 at 141.) Charles had to remove the asbestos insulation that covered a large

condenser in order to remove the "heads" on each end and work on and repair the tubes inside.

(Ex. 1 at 141-142.)  The condenser was about 48-60 inches in diameter and 12 to 16 feet long.

(Ex. 2 at 207-8.)  Once the head was removed, Charles had to scrape off an asbestos gasket.  (Ex.

2 at 208-9.)

Charles put the asbestos "block insulation on first and then covered it with asbestos

finishing cement and then asbestos cloth and a high temperature cement ... ."  (Ex. 2 at 210.)  The

insulation that had to be removed was about 2 inches thick.  (Ex. 6 at 2.)  Removal of the

insulation was done with hammers.  (Ex. 6 at 2.)

Amoco personnel "showed where the job was and what the job [entailed]."  (Ex. 1 at

142.)   Amoco engineers reviewed Charles' work on the condensers and signed a document with

regards to it.  (Ex. 1 at 143-144.)

Amoco's failure to provide Charles with any protection from the dangers of asbestos

exposure is rather surprising, because Amoco knew, as early as 1937, that asbestos was

dangerous. In 1937, Standard Oil Company, the predecessor to Amoco, issued a study entitled

6

"Dust Producing Operations In The Production Of Petroleum Products, A Medico-Safety Survey." (Exhibit 16). The Foreword for this Study is signed by the General Medical Director, and it states in part "it is the duty of industry to protect its employees," and "this report should serve as a guide to operating executives and safety engineers in handling personnel and in providing adequate protection in dusty operations." The Study discusses the physiological effects of asbestosis. (Exhibit 16 at page 7). It discusses insulation and guniting operations. (Exhibit 16 at 27-30). It discusses procedures for the handling of powdered or pulverized materials such as asbestos. (Exhibit 16 at 51-57). The Study also discusses measures for the reduction of the dust hazards. (Exhibit 16 at 74-82). The point is that decades before Charles was exposed to Amoco's asbestos, Amoco knew that asbestos was dangerous, and yet Amoco did nothing to protect Charles from this danger.


*Exxon Mobil Oil Corporation*

As a civilian, Charles worked at the Mobil Oil refinery for a month and a half in the 1970s, where he replaced the unit heater in 25 control rooms or control houses. (Ex. 1 at 76-77.) Replacing the heaters required removal of asbestos insulation from the steam lines. (Ex. 1 at 76-77.) Charles knew these steam lines were asbestos containing based on his later training in the 1990s about asbestos safety which he could relate back to the products he encountered in earlier years. (Ex. 1 at 78.)

Asbestos dust was generated in the process of removing the insulation from the steam lines; the dust was swept into bags with a broom and a dustpan. (Ex. 1 at 78-79.) Mobil personnel were present to authorize entry into the work areas and inspect the work performed.

7

(Ex. 1 at 79-80.)  Charles did not wear any respiratory protection while performing this work. (Ex. 1 at 213.)

During a major Mobil shut-down that took place in about the late 1980s, Mobil employees were present to provide Charles and other pipefitters with asbestos-containing gaskets.  (Ex. 6 at 2.)  These Mobil employees observed Charles as he performed work that involved scraping gaskets.  (Ex. 6 at 2.)  When Charles later worked at the Mobil site in the late 1980s, he had to "go through a safety course," was not allowed to go into areas of the site without respiratory protection, and the asbestos was marked with blue so that people would avoid disturbing it.  (Ex. 1 at 213-14.)

*No training of pipefitters for asbestos safety*

Charles was not trained in safety precautions for working around asbestos until the late 1980s.  (Ex. 1 at 75, 213-14.)  Charles himself had already been a foreman on many jobs, including BMW and Mobil Oil.  (Ex. 1 at 144.)  Joseph Ferriter was a pipefitter superintendent who was a member of Local 597, the same union as Charles, and Mr. Ferriter did not learn about the dangers of asbestos until 1988.  (Ex. 10 at 1, 5.)  Before 1988, worksites were contaminated by visible dust from the removal of asbestos containing materials.  (Ex. 10 at 5.)

*Expert Evidence*

Frank Parker, plaintiff's certified industrial hygienist, reviewed Charles Krik's work history and provided opinions about the significance of exposures as to certain activities and products.  A significant exposure is one in which a person comes in contact with asbestos

"concentrations, typically, two, three, four orders of magnitude of what you see in a typical ambient." (Ex. 8 at 188.)  These are discussed elsewhere in sections pertinent to the defendants.

Frank Parker has over 40 years of experience practicing industrial hygiene and environmental engineering including 7 years active duty and 17 years as a Reserve Officer with the US Air Force; 10 years experience working directly for the petrochemical industry; and over 25 years experience working as a consultant to government and industry. (Ex. 15 at 3.)

Mr. Parker is certified as an Certified Industrial Hygienist in the Comprehensive Practice of industrial hygiene by the American Board of Industrial Hygiene; a Professional Engineer in Texas and California; a Certified Safety Professional by the Board of Certified Safety Professionals.  (Ex. 15 at 3.)  Mr. Parker has been named as a Diplomat Environmental Engineer by the American Academy of Environmental Engineers.  (Ex. 15 at 3.)

Arthur Frank, MD, plaintiff's medical expert, reviewed Charles's work history, exposures to asbestos and Charles's medical records.  Dr. Frank attributed the lung cancer to asbestos exposure and smoking.  (Ex. 9 at 1.)   Dr. Frank stated, "Based upon my review of the materials sent me, it is my opinion, held with a reasonable degree of medical certainty . . . [that] cumulative exposures [Krik] had to asbestos, from any and all products, containing any and all fiber types, would have contributed to [his condition]."  (Ex. 9 at 1.)

<u>Argument</u>

In other MDL asbestos cases, this Court has stated the applicable standards for summary judgment:

> Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  'A motion for summary judgment will not be defeated by 'mere existence' of some disputed

facts, but will be denied when there is a genuine issue of material fact.' *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)). A fact is 'material' if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson,* 477 U.S. at 248.

In undertaking this analysis the court views the facts in the light most favorable to the non-moving party. 'After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party.' Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must 'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 250.

*Dion v. Anchor Packing Company*, 10-64681, 2011 U.S. Dist. LEXIS 151570 (E. D. Pa. Oct. 5, 2011).

*Owens-Illinois's Motion for Summary Judgment*

Owens-Illinois ("OI") argues Charles was not exposed to Kaylo made during the period before April 30, 1958, when OI was responsible for Kaylo.  OI omits significant portions of the record in making this argument.  Charles was exposed to Kaylo made by OI in the following ways:

- When directly assigned to work on the destroyers from 1954 until October 1958, Charles did "a lot" of boiler firebox repairs that required Kaylo. (Ex. 1 at 134; Charles affidavit.) Since the Kaylo had been in place for about 18 months before a firebox was overhauled, all of the Kaylo was made during the OI period.

- While performing the firebox repairs from 1954-58, Charles was also exposed to the

removal of Kaylo, which was the standard product used by the Navy for the first course of insulation on the destroyer firebox brickwork.

• Charles used Kaylo on the superheaters and steam chests of the destroyers he was assigned to from 1954-58.

• After being assigned to the Bryce Canyon repair ship, Charles continued to overhaul destroyer fireboxes at the rate of about every two months.  Charles was assigned to the BC in November, 1958, which was only 6 months after OI sold the Kaylo business.  The life of the Kaylo insulation before an overhaul was about 18 months.  Charles would have done about 9 overhauls during his first 18 months on the BC.  Drawing the inferences in favor of plaintiff as the non-moving party, most of the 9 overhauls involved removal of Kaylo sold during the OI period[1].

Plaintiff's industrial hygienist Frank Parker stated that the work using insulation blocks

---

[1]On April 30, 1958, OI sold its Kaylo Division to Owens-Corning Fiberglas Corporation (OCF).  (Ex 13, Kaylo sales agreement).  OI's responsibility for Kaylo materials extends beyond the date it sold the Kaylo manufacturing business on April 30, 1958.  The sale included:  "raw materials for the production of Products, Products in process of manufacture, finished Products in warehouse, and the manufacturing supplies and repair parts at the Kaylo plant".  (Ex 51, Kaylo sales agreement ¶ 2).  The cost of these raw materials, goods in process, and finished products was $633,661.41.  (Ex 13, Kaylo sales agreement ¶ 2).  OI is responsible for the unsold Kaylo inventory and Kaylo produced from the raw materials sold to the new owner.

In 1953, OCF agreed to act as the exclusive Kaylo distributor and purchase $3,400,000 of Kaylo annually.  (Ex 14, OI/OCF memorandum of agreement).  Based on this information, it can be inferred that the $633,661.41 inventory in 1958 was at least a three month supply, since some of the inventory was raw materials and materials in process that were not yet part of a finished product.  Thus the inventory sold by OI would extend its responsibility for Kaylo products or materials an additional 3 months or longer after the business was sold at the end of April 1958.

Additionally, the U.S. Military would have an inventory of Kaylo available that had been purchased from OI before the Kaylo business was sold to OCF.

11

on the brick work in Navy ships had been studied and "those studies resulted in high exposures." (Ex. 8 at 141.)  Mr. Parker characterized the exposures from Charles' naval work involving Kaylo insulation as "significant."  (Ex. 8 at 137-141.)

OI also argues the evidence fails to meet the standards for proving causation under maritime or Illinois law.  Plaintiffs discuss causation law in the memorandum separately filed in all Cascino Vaughan Law Offices cases titled "Plaintiffs' Brief on Asbestos Exposure Proximate Causation Law" and incorporates by reference that document in this memorandum.  Mr. Krik's repeated and frequent OI Kaylo exposures satisfy even the stringent causation arguments put forth by OI.

*Weil-McClain*'s *Motion for Summary Judgment*

In a supplemental brief, Weil-McClain argues that the evidence fails to meet the standards for proving causation under maritime or Illinois law.  Plaintiffs discuss causation law in the memorandum separately filed in all Cascino Vaughan Law Offices cases titled "Plaintiffs' Brief on Asbestos Exposure Proximate Causation Law" and incorporates by reference that document in this memorandum.  Defendants do not dispute that the plaintiff was exposed to asbestos from Weil-McClain boilers, but they dispute whether this exposure is sufficient to cause the plaintiff's injuries.

The work that plaintiff performed on Weil-McLain boilers involved repair of sections that were covered in a significant amount of asbestos.  The wicking and other materials from these boilers would have exposed plaintiff to airborne concentrations of asbestos that are many times

12

the "typical ambient" air concentrations that plaintiff's industrial hygienist Frank Parker referred

to in his deposition. In regard to the Weil-McLain boiler work, Mr. Parker stated:

> "Yes. Again, it's just like previous, handling of these are substantially a hundred percent
> asbestos wicks or gaskets. Just handling them will release fibers. Handling that many of
> them over periods or having been exposed for a period of days, depending on how much
> energy was put in them, you could have some peak exposures or pretty high. From an IH
> standpoint, all those exposures would increase his dose and increase his risk."

(Ex. 8 at 149-150.)

Weil McLain also argues the Indiana Statute of Repose bars the claims. This argument

fails because the exposures which form the basis of the claim against Weil-McLain arise from

work in Illinois. Weil McLain cites no authority to establish Charles' work in Illinois is

governed by Indiana law. The brief of co-defendant BP Amoco Chemical Company points to the

applicable law being Illinois where the injury occurred. (Memorandum of Law in Support of

Summary Judgment of Defendant BP Amoco Chemical Company at 4-5.) For the purposes of

summary judgment, plaintiff does not contest this analysis.

*BP America, Incorporated's Motion for Summary Judgment*

BP America argues that they owed no duty to the plaintiff because plaintiff was employed

by an independent contractor on the BP premises. BP cites case law that employers of an

independent contractor cannot be liable for the contractor's acts or omissions under § 414 of the

Restatement (Second) of Torts. BP's argument is irrelevant since plaintiff is not asserting a

claim under § 414.

Plaintiff's theories of premise liability are not based on § 414, but rather on § 343 of the Restatement (Second) of Torts and Illinois case law.  Under Illinois law, "sections 343 and 414 are not mutually exclusive; rather, each one offers an independent basis for recovery. . . . In other words, the duty of reasonable care imposed on a general contractor as the owner or possessor of the premises is independent of its duty to exercise reasonable care where it retains control of work entrusted to an independent contractor." *Clifford v Wharton Business Group, L.L.C.,* 353 Ill.App.3d 34, 41, 817 N.E.2d 1207, 1213-14 (1ˢᵗ Dist. 2004).

Legal issues relating to premises liability claims are discussed in plaintiff's "Brief On Illinois premise owner liability" which is incorporated by reference.  But in short, and as more fully explained therein, Charles has set forth a valid claim of premises liability under §343.  "It must be remembered that under our Premises Liability Act, and at least nominally under the common law, the landowner's or occupier's duty toward his invitees is always that of reasonable care."  *Ward v. K Mart Corporation*, 136 Ill.2d 132,147 (1990).  Furthermore, in Illinois a premise owner owes a nondelegable duty to provide a safe place to work.  "Borden hired Raymond's employer to perform routine maintenance in its resin plant. As a consequence, Borden owed Raymond and all other subcontractors a nondelegable duty of providing a safe place to work."  *Preze v. Borden Chemical, Inc.,* 336 Ill. App. 3d 52, 60, N.E.2d 710, 716 (1ˢᵗ Dist. 2002).  BP does not contest responsibility for the Amoco Chemical Refinery premises.  The asbestos insulation and gaskets on the condensers was a dangerous condition of the premises which created significant exposures when removed. Again, Charles has set forth a valid premises liability claim against BP, and this court should deny the motion for summary judgment.

The Standard Oil Study issued in 1937, with BP being the successor to Standard Oil, stands as further proof BP breached its duty of providing Charles with a safe place to work. BP knew asbestos was dangerous and yet it did nothing to protect Charles from this danger.  Further proof that the industry as a whole knew of the dangers of asbestos is set forth in the report of plaintiff's expert Barry Castleman, and specifically at pages 2-5 of the report.  (Exhibit 17, Report of Barry Castleman).  The basic point remains the same: BP knew asbestos was dangerous and did nothing to protect Charles from this danger.

Amoco also argues the exposures are not sufficient to be "a cause" of Mr. Krik's lung cancer.  BP relies upon law about circumstantial evidence of exposures.  Charles' exposures at the Amoco facility are direct and do not require circumstantial proof.

Plaintiff's industrial hygienist provides a scientific opinion that the exposures were "significant."   Mr. Parker states, "I have reviewed the testimony regarding Mr. Krik's work at Amoco.  My opinion to a reasonable degree of scientific certainty is that: Mr. Krik was occupationally exposed to significant concentrations of airborne asbestos fibers each time he had to disturb asbestos insulation in order to pull the heads off of condensers at the Amoco facility and gain access to and work on the tubing inside the boiler."  (Ex. 11 at ¶1.)  Mr. Parker stated that "significant" to him as a professional industrial hygienist "refers to exposures which are generated as a result of disturbance of asbestos containing materials in a work environment which add to the exposed individual's overall asbestos dose and thereby increases their risk for developing asbestos related diseases including lung cancer." (Ex 11, ¶3.)  The asbestos content of gaskets is 95%, asbestos cloth is 100%, block insulation is 10-15%, and cement (mud) is 5%. (Ex. 15 at ¶1.)  Mr. Parker also cites to extensive literature about the significance of exposures

during removal of 1) "TSI" or thermal systems insulation such as block, cloth, and mud insulation and 2) gasket removal.  (Ex. 15 at ¶¶2-3.)  Additional opinions concerning the significance of Charles's exposures to such materials are contained in Mr. Parker's Rule 26 report.  (Ex. 15 at ¶¶2-3.)

The medical testimony of Dr. Frank establishes Charles' asbestos exposures are cumulative and each is a contributing cause.  Dr. Frank concluded: "The cumulative exposures he had to asbestos, from any and all products, containing any and all fiber types, would have contributed to his developing these two conditions."   (Ex. 9 at 1.)  The evidence is sufficient to create a disputed issue of fact for the jury.


*Exxon Mobil Oil Corporation's Motion for Summary Judgment*

Exxon Mobil moves for summary judgment on a number of grounds.  First, Exxon contends that there is no evidence that plaintiff was exposed to asbestos fibers at the Mobil premise in sufficient quantities to cause his asbestos-related disease.

As discussed above, Plaintiff's industrial hygienist, Frank Parker determined by experience and research the asbestos content of the types of insulation materials involved during the work at Mobil.  This work included breaking into the asbestos covered steam lines that were connected to the 25 heaters being replaced.  Mr. Parker concluded: "Mr. Krik was occupationally exposed to significant concentrations of airborne asbestos fibers each time he had to disturb the asbestos containing insulation in order to break the steam lines connected to the steam units that he worked on at the Mobil Oil facility." (Ex. 11 at ¶2.)  The meaning of the term "significant" is

16

also discussed above.

Mobil contends the affidavit of Dr. Leroy Butler (their Exhibit D) establishes that the amount of asbestos in the air at the Mobil premises would have been the same as typical airborne levels.  Relying on Mr. Butler, Mobil argues that there is no evidence that Mr. Krik was occupationally exposed to asbestos.  Given the conflict of the experts, plaintiff has shown that there is a genuine issue of material fact over whether plaintiff was exposed to significant amounts of asbestos while working at Mobil.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3rd Cir. 1993) ("at the summary judgment stage, a court is not to weigh the evidence or make credibility determinations. . . . Instead, these tasks are left for the fact-finder").  *See also*, *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, 2008 U.S. Dist. LEXIS 7001 (E. D. Pa. 2008) ("[C]onflicting expert reports create a genuine issue of material fact thereby precluding summary judgment on [a] negligence claim").

Second, Mobil contends it owed the plaintiff no duty of care as the premises owner.  Legal issues relating to premises liability claims are discussed in plaintiff's "brief on Illinois premise owner liability" which is incorporated by reference.  But in short, and as more fully explained therein, Charles has set forth a valid claim of premises liability under §343.  "It must be remembered that under our Premises Liability Act, and at least nominally under the common law, the landowner's or occupier's duty toward his invitees is always that of reasonable care."  *Ward v. K Mart Corporation*, 136 Ill.2d 132,147 (1990).  Furthermore, in Illinois a premise owner owes a nondelegable duty to provide a safe place to work.  "Borden hired Raymond's employer to perform routine maintenance in its resin plant. As a consequence, Borden owed Raymond and all other subcontractors a nondelegable duty of providing a safe place to work."

17

*Preze v. Borden Chemical, Inc.,* 336 Ill. App. 3d 52, 60, N.E.2d 710, 716 (1st Dist. 2002).

Mobil breached its duty to provide Charles with a safe place to work.  The Standard Oil Company Study from 1937 is affirmative evidence that Mobil, as a member of the same industry as Standard Oil, would have known that asbestos was dangerous and knew how to protect potential victims from this danger.  The 1937 Study states its purpose is to provide guidance to the entire industry and not just to Standard Oil.  Despite this knowledge, Mobil did nothing to protect Charles from this danger.   This court should deny Mobil's motion for summary judgment.

Third, Mobil claims the plaintiff's claims are barred by the Illinois Construction Statute of Repose.  Legal issues relating to the statute of repose are discussed in plaintiff's "plaintiff's brief on the Illinois construction statute of repose" which is incorporated by reference.  But in short, and as more fully explained therein, the Illinois statute of repose does not apply to this case because the work Charles performed in this case amount to routine repair and maintenance, and such work does not constitute an "improvement to real property" that is required to come within the statute of repose.

"An improvement to real property is an addition which amounts to more than a mere repair or replacement and which substantially enhances the value of the property. It does not include ordinary maintenance." *Merritt v. Randall Painting Co*., 314 Ill. App. 3d 556, 561 (1st Dist. 2000).  In *Merrit*, the plaintiff alleged that the defendants were hired to "scrape, plaster patch, clean and paint" the interior of elementary school.  The court held "[w]e have no difficulty in finding that such work in an existing structure is nothing more than ordinary repair and

maintenance, and does not constitute an improvement to real property." *Id.* at 119.  Whether work constitutes "the construction of an improvement to real property" is a conclusion to be drawn from underlying factual allegations.  *Id.*

*Litchfield Cmty Unit Sch. Dist. No. 12 v. Specialty Waste Servs., Inc.*, 325 Ill. App. 3d 164 (5th Dist. 2001), holds "ordinary repair and maintenance" of a structural improvement is not protected by the CSOR.  *Litchfield* involved the removal of asbestos-containing material in acoustic tile ceiling and plaster from the walls of the building. *Id*. After removal, the ceiling tiles and the plaster that had been removed during the asbestos-removal procedure would be replaced and the walls repainted. *Id*.  The court held that the work "consisted of nothing more than ordinary repair and maintenance of an existing structure."  *Id*.  The fact that the specifications also included the replacement of some damaged floor tile and the installation of some additional wiring for existing light fixtures does not transform the nature of the work.  "The work is similar to patching plaster and applying a fresh coat of paint or replacing worn carpeting." *Id*.  *See also Morietta v. Reese Const. Co.,* 347 Ill. App. 3d 1077, 808 N.E.2d 1046, 1050 (5th Dist. 2004) (in considering the scope of the CSOR, appellate court states "however, an improvement is more than mere repair or replacement").

Finally, Mobil argues it cannot be liable for an injury that was open and obvious, with Mobil apparently taking the position that Charles knew of the dangers of asbestos, such that Mobil should not have owed Charles a duty to warn him of a danger he already knew.  Here, Mobil cannot raise the open and obvious defense to liability.  "Whether a possessor of land should guard against harm to the invitee, despite the obviousness of the danger, depends upon whether either the 'distraction exception'  or the 'deliberate encounter exception' applies in a

given case." *Sollami v. Eaton,* 201 Ill.2d 1, 16, 772 N.E.2d 215, 224 (2002).

The deliberate encounter exception was set forth by the Illinois Supreme Court in *LaFever v. Kemlite Co.,* 185 Ill.2d 380 (1998).  The *LaFever* court held the deliberate encounter exception applied, and thereby allowed for the defendant premise owner to be liable despite the open and obvious nature of the danger therein, because "Kemlite [the premise owner] could have reasonably foreseen that plaintiff would risk walking through the edge trim, because it was necessary for plaintiff to fulfill his employment obligations."  *LaFever,* 185 Ill.2d 380, 392, 706 N.E.2d at 448.  The deliberate encounter exception applies to Charles' case herein.  It applies because Charles was required to touch or otherwise be exposed to asbestos in the course of the work Charles was performing for Mobil.  Part and parcel of this work necessitated the removal of the asbestos in order to do the work.  This is a classic instance of the deliberate encounter exception.  Again, therefore, Mobil cannot rely upon the open and obvious defense to liability.

<u>Conclusion</u>

For the foregoing reasons, the court should deny the motions for summary judgment as to the defendants above, including Owens Illinois, Exxon Mobil Oil Corporation, Weil-McClain, and BP America, Incorporated.

Dated: January 27, 2012


Respectfully submitted,

/S/ Robert G. McCoy

Robert G. McCoy
Michael P. Cascino
Allen D. Vaughan
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-187(fax)
bmccoy@cvlo.com